Good morning, Your Honors. Thank you very much. I'm Mary Lou Hilberg, and I'm glad to be here for Mr. Guzman. And I have to begin the argument with a humble apology to the Court, because I realize I made a clerical error in this case that I don't want to be dispositive, and that is in the lower court noted that the Sixth Amendment issue that they believed had not been properly exhausted. The reason for that I did not discover until I was preparing for this argument. And I realized that the problem was mine, because I filed two different exhaustion writs in the California Supreme Court. This one, which did exhaust the Sixth Amendment issue, and this one, which exhausted another issue which I thought was a potential claim but later abandoned. When I filed my Second Amendment petition, and electronically, and I went to file the Exhibit 1, which was a copy of the petition, I electronically filed the wrong one. And I didn't realize my mistake until I was — excuse me for my gross stupidity in overlooking the obvious, but I knew I had filed it as an exhibit. I discussed it. So this is not a problem of having failed to raise the claim. This is a problem having failed to submit the document that supports the claim. Right. And I could file an amended abstract of record. I've discussed the matter with counsel this morning. I have an endorsed file. Is there an objection? Your Honor, there's no objection to her filing it. I don't agree with her conclusion, but we could discuss that. Of course you don't agree with her. No, I mean, of course you would not be agreeing with her conclusion, but you don't have an objection to counsel correcting an error. So if you just give me — We'll reset the clock to 10 minutes, and you may file it, and things like this happen. I never much care for electronic filing myself. I like to have — I like to see paper. That way it's so much more easier to make a mistake when you're sending a file. But in any event, it's fine. Thank you. You may go. Could you start right out by telling us what decision of the United States Supreme Court violated by the California court? Padilla. Well, I think that the duty to advise, if I can just — No, I'm not asking you for the duty. I'm asking you for the case. What case of the Supreme Court established the right you were contending for? For the right to be competently advised prior to entry of plea. I think the Supreme Court decision in Padilla 10 days ago, or I guess it's 13 days ago now, is dispositive in that particular area. If that's what the Court's question is, I'm sorry if I can't answer. I think the standard is that law had to be established at the time that the Supreme Court of California, or the highest California court, made its decision. What Supreme Court of the United States decision was in effect at the time that the California court decided against you? Okay. The — I would say Brady, Boykin, Hill v. Lockhart, Strickland, those are the cases that I think are firmly established United States Supreme Court precedent that are established that are — oh, and these are all cited in my brief. Lane v. Williams, assuming where the Court assumed but did not decide that the failure to advise of a mandatory parole term rendered a guilty plea constitutionally invalid, that's 1982. I think it's pretty clear, at least on — for the sake of this argument and the fact that I only have eight minutes, I'm going to — I'm not going to argue the question as to whether or not there's a Federal question on the insanity issue. I've briefed that as much as I can, and quite frankly, if you're asking me what Federal case controls on that, I can't come up with a better answer than what I briefed. I've thought about it. All right. And there are some that go against you, right? Yes. The Sixth Circuit, for example, says that it's not appropriate for — because of the — the burden is on you. Exactly. All right. I — yeah. I've raised the issue. I've briefed it as well as I can. And I wish I had more to argue, and I'll be honest with the Court in telling you I don't. But you have to rely on a Supreme Court case. I don't quibble with you at all. And if you had to go back to a Supreme Court case, you would say Jackson. Jackson. Okay. That's — Just so we understand each other. Yeah. Okay. I wish I had something better, but I don't. No, I understand. But you have to come up with a Supreme Court case. I have to come up with something. Even if it's general and not quite specific enough to your case, and there are arguments as to why Jackson doesn't apply. Right. But we have to go back. We have to say Jackson clearly established this, and it would be wrong for the — for the — it was unreasonable for the State courts to hold otherwise. Go ahead. You said you weren't going to argue that. We don't have to take up any more of your time on that. Go ahead and argue what you're going to argue. And I apologize to the Court, because I recognize now what you were arguing, which is, of course, the critical question in that issue. And I was focusing on the other issue. So I apologize, Justice Newman, that I didn't directly address your question. I don't have — But you were answering the question having to do with the — the sentencing issue and the notice that he was given. Exactly. And whether the lawyer was incompetent and failing to object. And due process. I have the two arguments, Fourteenth Amendment plus Sixth Amendment. I just briefly want to argue that, and I just would like to also reserve a little time at the end. Okay. I want to — I think 20 — California Penal Code 2933.1, in effect at the time — became effective in 1994. It was the controlling statute in effect at the time of his sentencing. It's very clear that he has to serve 85 percent of 30 years, 25 plus 5, before he's eligible for parole, under 2933.1, versus if it was simply the 25 to life, he'd have to serve 85 percent of the 25. And it's a little bit over 4 years of actual time at 85 percent. But you have — That would just be — that's the first time you're eligible for parole. That's the first time. If not, but life also can mean life. Absolutely. But it's when you're first eligible for parole. I just want to point out that in — this was a kind of negotiated disposition slow plea in which my client waived jury. And in his — in the writ that I filed in the State court, he says he would not have waived jury, he would not have pled, but for this kind of negotiated disposition where he thought the worst he was looking at was 25 to life. Well, he first had to, though. He first had to get the first stage over with in order to get to the NGI part of it. Correct? And so he took — but in the first stage, 25 to life really was what he was dealing with in terms of the murder part of it. The other years come from the enhancement. Correct? Correct. And the court on that, didn't he just waive jury and the court then decided that those priors were true? Or how did that work? Before he waived jury — Because that was sort of a slow plea there, isn't it? The first part was a plea and then the other was kind of a slow plea. Well, before he waived jury, he was told that on the whole kit and caboodle, he was facing a maximum of 25 to life. He wasn't told specifically that, oh, yeah, and there's other priors that are hanging over your head and that they could add more time later. He was never advised of that. He was led to believe that 25 to life was the whole upper end that he faced. And this is a compelling case, Justice. What is it exactly that he was told? He was told that if he agreed to waive jury and enter a no-contest plea to the voluntary manslaughter and submit the sanity findings to the court, that he wouldn't get more than 25 to life. That was the maximum that he was facing, period. He was told that more than once. Well, the transcript is a little unclear as to what exactly he was said, what was said to him, right? I'm sorry, sir. The transcript is a little unclear as to what exactly he was told, what were the words that he was — what words he was told. I understand it to say that this is your maximum exposure. That's right. Twice the maximum on the murder, but then the court did a trial on the enhancements, correct? But he was told, again, he wasn't told, yes, there's enhancements hanging over your head too. Yes, you can have more time. I mean, I think it's a very, very reasonable assumption from what he was told that that's the worst that he was looking at. And that's what he believed, and both trial counsel and appellate counsel believed that too. Now, there was no objection, and so you have to succeed on your — Sixth Amendment, yes. — on your strickland claim, right, in order to get past the procedural bar of failing to object. So — and both trial counsel and appellate counsel both admit, oops, we goof, we slipped. Just like I slipped in filing the — we're all human beings, Justice, and, you know, we do the best we can. Well, the fact that lawyers later say, oops, I slipped, on behalf of a client, it's almost de rigueur. I mean, it's not like having a corporate client. You say, oops, I slipped, and they might sue you. I think that's a reasonable assumption.  I think that saying this for somebody who's in prison does him a favor without much cost to the lawyer. But — Because I think it's understood that — But the records — Well, he has to — — show that he would not have pled but for this, correct? And he does say that. And he was facing first-degree — it has to be — now, I guess the thing is he says that now. Right. But he was facing first-degree murder, right? Right. Which — how would that have been different than the manslaughter? Well, I think this case is extremely compelling in the facts. Well, first-degree — but, you know, this — I didn't fall off the turnip truck yesterday. And when your client gets an offer for voluntary manslaughter as opposed to first-degree murder, there's a substantial benefit that is incurred. And so for someone to say X amount of years later, I wouldn't have taken that when he was looking down the barrel at a first-degree murder, he's got to say more than just the bare allegations. So what else do we have in the record to show prejudice that he really wouldn't have done that? Well, I would suggest to the Court that maybe the remedy on that is that we remand it for an evidentiary hearing and let Mr. Guzman testify and let the district court make its own credibility determinations. Mr. Guzman is adamant that he wouldn't have. Mr. Guzman has, we know, a long history of severe psychosis. Now, maybe Mr. Guzman should have taken — He didn't shout out at the time, wait a minute, that's not the deal I got. I just — When he heard 31 years to life, he didn't say, wait a minute, where does 31 come from, right? I'm saying the record — the record certainly supports his claim that he wasn't properly advised. He states under penalty of perjury that he wouldn't have taken the deal. Whether or not that's really advisable or not, I'm not the trial attorney. I'm — I'm way far down — All right. But was he facing a no parole situation as opposed to — No. No. So what was he facing? First-degree murder is not the same as voluntary. So what was he facing? No, he was facing 25 — he was basically facing 25 to life or 25 to life. And they couldn't have really given him more time. Because — Why — 26 to life, because personally — It was not a capital case. No. So — And short of a capital case for first-degree murder, there's no — the maximum sentence is 25 to life?    Oh. It's past mathematical. Plus one year — oh, no, I — back that … plus one year for the — for the knife, plus five years for the prior. I'm not sure if it would be 50 to life or 25 to life. To tell you the God's truth is I'm not sure if the strike priors run consecutive or concurrent as a … Aside from what the consequence would have been, there was a serious risk that he would be found guilty of first-degree murder. Except that I think the facts of this case are so compelling that this is a gentleman who had just been to the district attorney's office saying, help me, help me, help me, because my wife is trying to kill me. All right. But the reason you can't show prejudice is because he did, in fact, have a trial on the NGI, and he was found to be sane. But he weighed very on that trial. That's the problem. Well, I know. But if he hadn't had a trial, then you could argue maybe it would have come out differently. But here we have a trial, so we know he was found sane. So that, you know, the fact that he decided not to have a jury or not, obviously, there was a certain benefit to him doing it that way. And could have, would have, should have is, you know, hindsight, you know, 20-20. But I again remind the Court that the question is what Mr. Guzman honestly would have done. And I can sympathize with the Court's … You are out of time. Thank you. Okay. We'll hear from the Warden. Good morning, Your Honors. Craig Myers for Respondent. I'd like to just briefly address the unexhausted issue. There were two issues that were brought under ineffective assistance of counsel. One was for failure to advise Mr. Guzman of the plea, and one was for failure to object. The pleading that Ms. Hilberg gave me talks about failure to object only, not failure to advise. So the district court found that it was unexhausted. I still submit it was unexhausted, and that portion is still unexhausted. Just out of curiosity, in this situation, what was the defendant or the appellant looking at when he was, before he got the reduced manslaughter? He was facing 81 years to life. The base sentence for murder is 25 to life, and penal code section 667, I believe it's D, says it's either 25 to life on a third strike or a tripling of the penalty. Right, because he had, he was a three striker. He was a three striker, plus there was a 667A, which would have added five years, because it was a serious felony, plus one year for the knife use enhancement. So he was initially facing 81 years to life for first-degree murder, and the plea bargain was brought down to voluntary manslaughter, which had, I think it was, three, six, or 11 years, plus one year for the knife use enhancement, and then he was going to have a trial on the priors that could bring it to 25 to life. And so the life sentence still came from the three strikes? Yes. But, because the manslaughter is a determinate sentence, correct? The manslaughter is determinate, and he didn't. But you didn't ask for tripling the sentence on 25 to life? For the murder, no. On manslaughter, what he pledged to, and the Court advised him, when they're just talking about the voluntary manslaughter, and the Court advised him and Respondent maintains that the minimum sentence for manslaughter would be 25 to life, plus I'd like to point out that he did admit in the same proceeding, and this is at the second volume of the excerpts of records, page 14, that he admitted the knife use enhancement, and the Court had told him that there was one additional year for the knife use enhancement. So your argument would be that even though the 25 to life advisement was incorrect, that it was actually 31 to life, that he got, if we even got to the issue, is that he was, he entered that plea for a considerable benefit and a down, and therefore he wouldn't be able to show prejudice that he would not have entered the plea? Exactly. And that goes to the Supreme Court's decision in both Brady v. U.S. and Breck v. Abrahamson, where the Petitioner has to show that he would not have pled guilty but for any alleged error, and there must have been a substantial and injurious outcome on the proceedings. And life sentence is a life sentence, and it's just minimum eligibility for parole, 25 years versus 31. I think to come back years later and submit a declaration, I wouldn't have pled guilty, I think just there's zero credibility. There's no reason to have an evidentiary hearing on that. Practical difference, as a practical matter, somebody in Petitioner's position in 1999, at the time of conviction, would a sentence of 25 to life versus 31 to life versus 81 to life really make a practical difference? Was there any chance he'd get parole anyway? Well, I don't want to speculate. I mean, it's a life sentence. As a practical matter. Well, the eligibility for parole is calculated at 85 percent of the 81 or 85 percent of the 31 or 85 percent of the 25, right? Yeah, that's arguable. I mean, the first state that you'd be eligible. Correct. That doesn't mean you'd get parole. Right. And, you know, the guy stabbed his wife in the back several times. It's not likely that he's going to get parole at his first eligibility anyway. But I don't want to speculate that because it was always a life sentence. And California has held that an eligibility for parole does not transmute a life sentence from anything but a life sentence. And he had the life sentence. And the fact that nobody in the courtroom objected, this was a negotiated plea. His own counsel, Petitioner himself, the trial judge, and the prosecutor, because everyone was aware that it was going to be 31 to life, that was the sentence. Because the discussion on 25 to life was just based on the voluntary manslaughter. And there was a discussion that his counsel said, I'm going to make a motion, a Romero motion, to strike the priors. And the Court says, you can do that. I'm not guaranteeing that I will strike any priors, but there is a possibility. That was the sole discussion on the 25 to life. It was pled and proven. Actually, there was two 667A enhancements that were alleged that would give you five years. But because the priors were not pled and proven in separate trials, only one could have been alleged. And the trial court eventually struck one. I wonder if I could direct your attention to the issue that your opposing counsel didn't argue orally. I look at this record, and he seems as crazy as a man can be. And I do think, as Judge Kaczynski said, that Jackson against Virginia is a relevant case. So what is the evidence that he was saying? Urn, Your Honor, there are three doctors who testified at the trial. Right. And one of them, Dr. Jaffe, found that he was saying that he. Let's pause at what he said. Do you remember what he said, Dr. Jaffe? He said he was saying because he thought his wife was going to kill him. And he knew that was wrong for his wife to kill him. Is that knowing the difference between right and wrong? Well, his wife was sitting at a computer with his back facing him, and he went and stabbed her. Yes. No, please focus on my question. Dr. Jaffe says he knew right from wrong because he knew it was wrong for his wife to kill him. Correct. Does that mean that he knows right from wrong? Well, his testimony was actually that he knew right from wrong because. Because he knew his wife was going to do something wrong to him. No, but there's also other reason that Dr. Jaffe relied on, the fact that Petitioner admitted to him, and he said, I screwed up, and then, quote, unquote, I fucked up. And then previously in the day, he had gone to the. Well, now, wait a minute. This is what he's saying post-factum, isn't it? Sure, but he's talking about what he was feeling at the time, and who's going to know what was happening at the time besides Petitioner himself. And he had gone previously because he was afraid of his wife. He had gone to seek help, so he knew he could flee. He knew he could seek help. She didn't attack him. There's no evidence of that, and it's based on Petitioner's own words. Well, nobody, I think, is defending the idea that the only thing he had to do was to kill his wife. The question is, did he know what he was doing was wrong? Well, the trial court found that he did. Well, but the trial court had to have. He couldn't. The judge just couldn't do it out of the air. He had to have some evidence. Correct. And what was the evidence? All right. I'm going to – let me find a preview because – okay. This is what the Third District Court of Appeal held. They said, The trial court was presented with a fine question concerning when defendant was in reality and wasn't aware of the wrongfulness of his act. He found that although his mental disorders caused him to be in fear for his wife, the fear was not so great as to erase his understanding that what he was doing was wrong. This was supported by the testimony of Dr. Jaffe, and Dr. Jaffe is indicating that when defendant was stabbing his wife, he did not flip-flop back and forth, and he knew that it was wrong because she was asking him, Why are you killing me? The fact that we have two other doctors who indicate that there's evidence that he was insane doesn't negate the evidence that the trial court found true. The trial court – I think you're absolutely right on that. What I'm focusing on is what did the trial court go on as far as what Jaffe said? That defendant knew at the time that he was killing his wife, that he knew right from wrong, and he knew the – He says that, but what's the basis? He based that on his interview with the petitioner and based on the facts and circumstances of the case. What leaps out at me is Dr. Jaffe says he knew he was doing something wrong because he knew it was wrong for his wife to seek to kill him. Is it a different analysis in that NGI is an affirmative defense and not the prosecutor's burden in terms of how you look at the sufficiency of the evidence? Yes, it is. It's an affirmative defense with the burden on the petitioner with the preponderance of the evidence because you're presumed to be sane at the time he committed a crime in California. And as a district court held, there is sort of dual standards, but as the Court said, under either standard, the Jackson standard or a different standard, that the evidence is sufficient. And that's the position that Respondent takes, that the evidence is sufficient because you have the testimony of Dr. Jaffe, and also you have the trial court who's observing petitioner testifying, observing these people testifying, and he's making factual determinations based on what he observed in court. Going – I'm sorry. Do you have a question? Well, the court of appeal also relied on another aspect of Dr. Jaffe's testimony, the flip-flop evidence. It says that he – people don't go in and out of delusions. Yeah, he said that people flop back and forth from reality to delusion. Correct. He had said that because he had gone – knew that his wife was – or thought his wife was trying to kill him. I believe he thought she was communicating with the CIA through her computer, and he had gone to seek help. And then when he came home, she was on the computer, and he stabbed her in the back. There was no aggressive action by her. And just looking at, you know, the totality of circumstances. Do you concede that Jackson applies here? Well, I agree with the district court that Jackson doesn't apply perfectly, because Jackson is based on the sufficiency of the evidence when the prosecution has the sole burden of proof. But taking Jackson or a different standard, the evidence is presented that it's sufficient, it's overwhelming, and it's sufficient that he was sane at the time he killed his wife. Yes, sir. I realize we have circuit cases. Is there any clearly established U.S. Supreme Court precedent in this area? I don't believe so. I wasn't able to find any in that case, which, you know, goes to the fact that the issue of sanity is really not a Federal question. There's been no U.S. Supreme Court case. Well, if there was no evidence at all, none, he has the burden of proof at the State level, right? He has the proof. Correct me if I'm wrong. This is my understanding. The prosecution presents its case, and then defendant has to prove a lack of sanity or insanity by a preponderance of the evidence. That's correct. Am I correct so far? Yes. So if we look at the record, and it turns out he puts in evidence of that he was saying for some reason that this attorney puts in nothing at all, zero, and all the evidence on sanity supports a lack of sanity or insanity, and there's nothing the other way, you say it's not a Federal question at all, but I assume you would concede that some form of Jackson implies in that if there's no evidence supporting, well, if all evidence supports affirmative defense and there's no contrary evidence, then a rational trial effect could not but find that he was insane. Yeah. I would agree under those circumstances. So that's the limiting case. The limiting case is there's zero evidence supporting sanity, all evidence is for insanity. Correct. The question is what happens in the in-between case, how does Jackson apply, if at all, when the burden is reversed, there is some evidence, although we can talk about how substantial it is, supporting sanity, and most evidence supports insanity. What's your view as to how Jackson applies in that? Well, Jackson would apply whether there's, what the trial court relied on is the substantial evidence to support the trial court's finding. Okay. So if we look at the evidence supporting sanity and we say this is a scintilla or less, then you would agree, I know you wouldn't agree that that's what it is, but if that were the record, that would be just like the limiting case, in that there would be, although there would be some evidence, if we think it's essentially a scintilla or less, then that would be like a case where there's no evidence at all of sanity. Correct. Well, I'm assuming when you evaluate evidence, though, that you're not conceding that you have a duty to call witnesses, but the evidence would be looked at where the defendant has the burden, say, that the cross-examination would be considered. Obviously, the credibility of the expert. Obviously, if an expert came in and they weren't even a psychiatrist and they just said, I think he's insane, that would be subject to scrutiny in terms of what the person's qualifications were, too. Right? Yes, Your Honor. And that would go to the reasonableness of the trial court's finding based on that would be evidence. So when you look at sufficiency, that would include cross-examination or, you know, it's not necessarily elevating it to a duty to the prosecution to call witnesses, but I think what Judge Kaczynski is saying, if, say, there were credible witnesses and there's no cross-examination, there's not anything, and there's nothing that that might present a different case. Right. And that's what I understood it to mean. And then, you know, just going back to this case, that's just not what we have. So it's, you know, it's an interesting discussion, but here we have a certified psychiatrist. I was reacting to your statement, which I may have heard more broadly than you meant it, where you said there's no role for the federal courts to play at all. And I think what you must have meant is there's no role in this case for the federal courts to play. Yes. But in a theoretical case where, for some reason, the district attorney falls asleep, doesn't cross-examine, I mean, there's nothing at all, you would say there is a place for the federal courts to come in. If, in fact, the DA puts in evidence, either by way of cross-examination or its own witnesses or whatever, in that case, we apply the normal differential AEDPA standard that applies to factual matters. Correct. Okay. Correct. I think we are seeing, I mean, I think we understand each other. Okay. Okay. You are way out of time. All right. Well, thank you very much. Okay. You are out of time as well, but we'll give you a minute or so for rebuttal if you should take it, because we did take additional time with your opposing counsel. Thank you, Justices. If the Court wants to apply the substantial evidence test, I'd be happy. We all agree that Mr. Guzman... How do you get around the Jaffe declaration? I mean, he's a regular doc. I mean, you know, he's an expert. He said that he asked Mr. Guzman, did you know that it was wrong to kill your wife? And Mr. Guzman said, yes, he knew it was wrong, but the clear implication was it was afterwards. He didn't want to kill his wife. He thinks that he, to this day, rules the fact he had to kill his wife, even if it was true that she was about to kill him. He thinks it was wrong to kill his wife, morally. Yes, he does. Well, but California... But it would legally... California, as I understand it, has a particularly stringent form of monotony. It doesn't go into these new-fangled insanity offenses like I couldn't control myself or anything like that. Right. If you know it's wrong at the time you do it, that's enough, even if you have felt some strong impulse. I'm not arguing with you about this case. I'm just trying to get a clear reading of California law. If, when you do it, I'm going back to law school. If you think you're stabbing a watermelon or strangling a watermelon, obviously, in that case, you're insane. And if you are doing it, you don't realize when you're doing it that it's wrong, and the jury believes that, then you've got an insanity defense. But if you do it, you realize it's a human being, you realize that it's wrong, and you do it anyway, even if you feel a strong urge to do it or you feel compelled or necessity, that's no longer an insanity defense. That's no longer insanity for, as California defines it. Do you have any other questions about the defendant? Yes. Can I ask you, is there somewhere in the record that Guzman tells Dr. Jaffe, at the time I was killing my wife, I knew it was wrong? No. Nowhere. And Dr. Jaffe acknowledges that Mr. Guzman was incapable of the time, at the time, of understanding what his wife's legal rights were at the time. He just believed that she was going to kill him. Everybody agrees that that was the case. But McNaughton doesn't look at legal rights. It looks at moral judgments. But it's not wrong to kill someone who you honestly believe is about to kill you. It's not. I guess it. Well, she wasn't honestly about to kill him. I mean, she wasn't. The reality is, so what we have to decide is, when he said it was wrong to kill her, was that how he felt at the time that he killed her, or is that just something that he said later? Right? Because if he just came to that conclusion later, but at the time he didn't know the difference, that he didn't know that it was wrong, then he's, if believed, he's not guilty by reason of insanity. Right. And I think the record's pretty clear that the prosecution never showed that he knew it was wrong at the time he actually stabbed her. Well, they didn't have to. You had to show by a preponderance that. Right. But I think we did show that when Dr. Jaffe in his testimony acknowledges Mr. Guzman was incapable of understanding his wife's legal rights at the time of the stabbing, at the crucial moment. But that doesn't matter, that he understood her legal rights doesn't matter. But doesn't that matter in terms of whether or not it's wrong to stab her if he, if he, that's what I think. I think California provides a defense, and that's the defense of imperfect self-defense. Actual self-defense, you see somebody coming at you with a knife, they really are coming at you with a knife, and you pull out a gun and shoot them, provided that you can, you know, the facts are established. Then you've got self-defense, and that's a complete defense. If it turns out that a person is holding not a knife but a banana, and you think, oh, I, you know, that's imperfect self-defense. As I recall, California law, that is not a full defense to a homicide charge. That's involuntary manslaughter, or, you know, it is still legally, you know, it's still legally culpable. He may be. As far as he thinks his wife wrongly is trying to kill him, isn't that, hasn't he had the most established imperfect self-defense? But as the Court just stated, it could also be an involuntary manslaughter if he was unconscious. If we stick to the evidence, though, if we stick to the evidence, it seems to me that if you consider Dr. Jaffe's testimony as a whole, it was that he opined Guzman did not believe his wife was an imminent threat to him, and that because Guzman could not slip in and out of reality so quickly, it was not reasonable to believe that he knew the stabbing was wrong immediately after he killed his wife but not immediately before. Didn't Jaffe say that? Yes, he did. All right. So why isn't that just enough right there, if believed? Because at the same time, he did testify that Mr. Guzman was completely delusional and could not understand that what he was doing, he was aware that she could harm him and that he knew that that was wrong. And he was reacting to that because he believed it necessary to save his life, because of the delusion. I just – I know I'm belating the point, but I just wanted to leave the Court with two other thoughts as to firmly establish Supreme Court law that I did cite in my briefs, and that is Hicks and Winship. Very swiftly. What? Very swiftly, please. You're way over. Okay. I just want to say Hicks and Winship, and I'll be quiet. Thank you. Hicks and Winship. Thank you. All right. Case decided. We'll stand some minutes.
judges: Kozinski, Noonan, Callahan